KATHY A.F. DAVIS (4022)
JAKE M. GARFIELD (15603)
Assistant Attorneys General
Utah Attorney General's Office
KENDALL G. LAWS (14700)
Special Assistant Attorney General
SEAN D. REYES (7969)
UTAH ATTORNEY GENERAL
1594 West North Temple, Suite 300
Salt Lake City, Utah 84116
kathydavis@agutah.gov
jgarfield@agutah.gov
klaws@utah.gov

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF UTAH, SOUTHERN DIVISION

| | |
|---|---|
| STATE OF UTAH, including the UTAH SCHOOL AND INSTITUTIONAL TRUST LANDS ADMINISTRATION (SITLA), an agency of the State of Utah,<br><br><br>      Plaintiffs,<br><br>vs.<br><br>DEB HAALAND, in her official capacity as SECRETARY OF THE INTERIOR; the DEPARTMENT OF THE INTERIOR, an agency of the United States of America; TRACY STONE-MANNING, in her official capacity as DIRECTOR OF THE BUREAU OF LAND MANAGEMENT; and the BUREAU OF LAND MANAGEMENT, an agency of the United States of America,<br><br>      Defendants, | Case No. _____<br><br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiffs, State of Utah, including the Utah School and Institutional Trust Lands Administration ("SITLA"), file this Complaint for Declaratory and Injunctive Relief against Defendants, Deb Haaland, in her official capacity as Secretary of the U.S. Department of the Interior ("DOI"), the DOI, Tracy Stone-Manning, in her official capacity as the Director of the U.S. Bureau of Land Management ("BLM"), and the BLM, and allege as follows:

## INTRODUCTION

1.      The Labyrinth/Gemini Bridges area consists of approximately 303,994 acres of federal public land located in Grand County, Utah, and entirely within the BLM's Moab Field Office.   The area provides some of the most sought-after off-highway vehicle ("OHV") recreation opportunities in the United States.  With tall canyon walls towering above the Green River and massive outcroppings of entrada sandstone, this scenic region of Utah draws visitors from across the world to enjoy dispersed camping, motorcycling, jeeping, OHVing, and other recreational activities across a network of motorized roads and trails.

2.      The Labyrinth/Gemini Bridges area is essentially surrounded on all three sides by the Labyrinth Canyon Wilderness Area, Canyonlands National Park, and Arches National Park – three areas of federal public lands where OHVs[1] are prohibited due to the Wilderness Act or National Park Service regulations. *See e.g.* 16 U.S.C. § 1131 et seq.   The Labyrinth/Gemini Bridges area provides a wonderful alternative for prime motorized recreation in landscapes similar to the Labyrinth Canyon Wilderness Area, Canyonlands National Park, or Arches National Park, but free of the OHV restrictions in those areas.

3.      In 2020, the BLM initiated the development of a Travel Management Plan ("TMP") for the Labyrinth/Gemini Bridges area, called the Labyrinth/Gemini Bridges TMP. The

---

[1] There terms OHVs ("off-highway vehicles"), ATVs ("all-terrain vehicles"), UTVs ("utility terrain vehicles"), and ORVs ("off-road vehicles") are often used interchangeably (although usage between terms can have subtle differences) and generally refer to vehicles primarily intended to be used off of paved roads.

Labyrinth/Gemini Bridges TMP evaluated whether to keep roads open, limit them to certain uses, or close them to all motorized uses.



*Spring Canyon Bottom Road, County Road #1526 (a claimed R.S. 2477 road) – closed under the BLM's Labyrinth/Gemini Bridges Decision Record*

4.      After a years-long planning process, the BLM issued its final Decision Record ("DR") for the Labyrinth/Gemini Bridges TMP on September 28, 2023.  *See* Exhibit #1, Labyrinth/Gemini Bridges Travel Management Plan Decision Record.  The BLM's DR ultimately closed motorized access to 317.2 miles of existing motorized routes within the Travel Management Area ("TMA"), while limiting access (either to certain types of vehicles or during certain times of the year) on an additional 98.4 miles.  *See* Exhibit #2, Map of Roads Closed by the Labyrinth Gemini Bridges TMP DR.  As a result, only 712.1 miles of roads were left open year-round to all motorized vehicles.  DR,

at 2.

5.      Of the 317.2 miles of closed routes, approximately 114 miles are roads currently subject to a lawsuit brought in this Court by the State and Grand County against the BLM in 2012 under the Quiet Title Act.  *Grand County v. United States of America,* Case No. 2:12-cv-00466-CW (D. Utah 2012), Dkt. #2 (hereinafter "Grand County R.S. 2477 case"). That lawsuit seeks to quiet title to numerous roads in Grand County which cross BLM land under the Mining Act of 1866 (usually referred to as R.S. 2477). That case is currently stayed to allow the State to conduct discovery on the roads at issue, and to allow for a bellwether case on related legal issues to proceed in Kane County, Utah.

6.      Counsel for Plaintiffs are currently conducting discovery on roads included in the State's Grand County R.S. 2477 case, including the 114 miles of roads closed in the BLM's DR that were already at issue in the R.S. 2477 case.

7.      As part of the discovery process, Plaintiff's attorneys regularly visit and drive the length of claimed R.S. 2477 roads, primarily in the company of preservation witnesses. Visiting and driving the claimed R.S. 2477 roads is an essential step in Plaintiff's discovery process and vital to the resolution of this case.

8.      Prior to the BLM's closure of 114 miles of claimed R.S. 2477 roads in the Labyrinth/Gemini Bridges TMA, Plaintiff's attorneys planned to visit and drive the length of these roads during the current R.S. 2477 deposition block.  These drives would have occurred in the company of preservation witnesses as part of the discovery process.

9.      Plaintiff's attorneys are now barred from conducting their established discovery process of driving with witnesses on the 114 miles of claimed R.S. 2477 roads closed by the BLM's DR.  Many of the witnesses are elderly or infirm,[2] and it is imperative for the State to drive on the

_____

[2] All R.S. 2477 preservation witnesses must be over the age of 60 at the time of the deposition, per the Case Management

roads with the witnesses and conduct the depositions while the witnesses are still able to do so. Many of the elderly witnesses may have small windows within which they are still physically capable of driving on the roads with counsel for the State or participating in a deposition. Counsel for the State is preparing to conduct depositions in Grand County in the coming months, and is now barred from driving on the roads closed by this DR.

10.    Many of the claimed R.S. 2477 roads closed by the BLM's DR are exceptionally well-used popular routes for motorized recreation and dispersed camping. These routes provide unique opportunities for the public to visit scenic and remote backcountry locations. These routes are particularly popular for mobility-limited people who struggle hiking or walking over rough terrain to see similar scenery in adjacent areas where OHVs are prohibited.

11.    These popular routes include the 9.41-mile Hell Roaring Road in Hell Roaring Canyon, the 2.82-mile Spring Canyon Botton Road in Labyrinth Canyon along the banks of the Green River, the 9.06-mile Hey Joe Canyon Road that follows Labyrinth Canyon into Hey Joe Canyon, and the 4.95-mile Knoll Road that leads to a scenic lookout over the Colorado River.

12.    Prior to the issuance of the BLM's September 28, 2023 DR, all 317.2 miles of these closed roads, including the 114 miles of claimed R.S. 2477 roads, were open to the public under the BLM's 2008 Moab Field Office Resource Management Plan (hereinafter "Moab RMP"). *See* Exhibit #3, 2008 Moab Field Office Resource Management Plan Map #2 "Designated Routes."

13.    In October 2008, the BLM finalized the Moab RMP, which encompassed the entirety of Grand County. Included with the 2008 Moab RMP were maps depicting routes specifically designated as open to motorized use. All county roads crossing BLM land within Grand County, including Class B roads under UTAH CODE §72-3-103 and Class D roads under UTAH CODE §72-3-

---

Order in *Rich County et al v. U.S.A. et al.,* Case 2:12-cv-00424-CW, Docket No. 50. Most are significantly older.

5

105   were incorporated in the travel maps for the Moab RMP and designated as open to motorized

use.  These same roads designated as open in the 2008 Moab RMP were later included as claimed

R.S. 2477 roads in Plaintiffs' Grand County R.S. 2477 case.



*Hey Joe Canyon Road #1527 (a claimed R.S. 2477 road) – closed at this point under the BLM's Labyrinth/Gemini Bridges Decision Record*

14.    Every year for the past twenty-five years, the Southern Utah Wilderness Alliance

("SUWA") and a few members of Congress sponsor a bill called the Red Rock Wilderness Bill, aimed

at creating millions of additional acres of congressionally designated wilderness throughout Utah. The

bill has never succeeded. The approximately 317.2 miles of routes and route segments that were

closed by BLM's DR are within the area SUWA has unsuccessfully sought to have Congressionally

designated as Red Rock Wilderness.  *See* Exhibit #4, Map of Proposed Wilderness Area, Red Rock

Wilderness Act.

15.     In December 2008, SUWA and other environmental plaintiffs filed a complaint against the BLM in the U.S. District Court for the District of Columbia for alleged defects in the Moab RMP, as well as alleged defects in other BLM resource management plans issued in BLM field offices across Utah.  The complaint specifically challenged the travel provisions and route designations in the Moab RMP.  *Southern Utah Wilderness Alliance et al v. Allred et al*, No. 1:08-cv-02187, 2009 WL 765882 (D.D.C. Jan. 17, 2009)(later consolidated with Case No. 2:12-cv-00257-DAK and transferred to the District of Utah).

16.     After SUWA filed its complaint, the State (along with numerous counties and community organizations) successfully intervened in the lawsuit to support the BLM's DR for the Moab RMP and the other BLM resource management plans.

17.     After many years of litigation, SUWA and other environmental plaintiffs signed a settlement agreement in January 2017 ("SUWA Settlement Agreement")(*see* Exhibit #5) with the BLM.  The SUWA Settlement Agreement required the BLM to generate new TMPs in certain TMAs, including a new TMP for the Labyrinth/Gemini Bridges area in Grand County.  The SUWA Settlement Agreement also required the BLM to complete the Labyrinth/Gemini Bridges TMP within six years.

18.     The State of Utah, as a Defendant-Intervenor, was excluded from the settlement negotiations between SUWA and the BLM and later objected to the SUWA Settlement Agreement.

19.     Utah appealed the SUWA Settlement Agreement to the U.S. Court of Appeals for the Tenth Circuit, but the State's challenge was dismissed as unripe for adjudication.  Case No. 2:12-cv-00257-DAK, Document No. 010110080254.

20.     Pursuant to the SUWA Settlement Agreement, in 2019 the BLM began developing the Labyrinth/Gemini Bridges TMP.  Utah, through its state agency known as the Public Lands Policy Coordinating Office ("PLPCO"), signed a Memorandum of Understanding with the BLM in January

2019.  The purpose of this Memorandum of Understanding was to allow the State to participate in the planning process for the Labyrinth/Gemini Bridges TMP as a cooperating agency.

21.     As a cooperating agency, the State participated in a series of "route evaluation meetings" hosted by the BLM from March 2019 to April 2020.  The meetings were intended to develop a range of alternatives for the Labyrinth/Gemini Bridges TMP.  While participating in the route evaluation meetings, the State, through PLPCO, continually expressed the State's position that claimed R.S. 2477 roads should remain open under all alternatives in the draft TMP, pending the adjudication of the R.S. 2477 claims under the State's ongoing Grand County R.S. 2477 case.

22.     On April 26, 2021, the State submitted scoping comments to the BLM on the Labyrinth/Gemini Bridges TMP.  The State also submitted a comment letter as part of the BLM's cooperating agency review on December 10, 2021.  In this letter, the State explained the need for all claimed R.S. 2477 roads to remain open under the travel management plan until such time as the State's claims could be fully and finally adjudicated.  On October 6, 2022, the State submitted yet another comment letter during the BLM's public comment period reiterating the need for the BLM to keep all claimed R.S. 2477 roads open until adjudicated.

23.     The BLM released its final DR for the Labyrinth/Gemini Bridges TMP on September 28, 2023.

24.     On October 25, 2023, Utah Governor Spencer Cox submitted his Governor's Consistency Review letter to the BLM.  The Governor's letter detailed the inconsistencies between the Labyrinth/Gemini Bridges TMP and Utah's Statewide Resource Management Plan.  The Governor's letter also explained the need to keep all claimed R.S. 2477 roads open until final adjudication.  Despite Governor Cox's letter and Utah's position as a cooperating agency, the BLM declined to make any changes to the Labyrinth/Gemini Bridges TMP.

25.     Seeking to stay the BLM's implementation of the Labyrinth/Gemini Bridges TMP, the

State filed a Notice of Appeal and Petition for Stay with DOI's Interior Board of Land Appeals ("IBLA") on October 27, 2023. The IBLA denied the State's Petition for Stay in an order dated November 28, 2023.

26.     As a result of the denial, the State of Utah then moved to voluntarily dismiss its appeal from the IBLA on December 7, 2023.

## JURISDICTION AND VENUE

27.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 2201 (declaratory judgment); 28 U.S.C. § 1361 (mandamus); the Federal Land Policy Management Act ("FLPMA"), 43 U.S.C. §§ 1701-1784; the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-35; and the federal Administrative Procedure Act ("APA"), 5 U.S.C. § 706.

28.     Judicial review of Defendants' actions is also available under the doctrine of non-statutory judicial review of agency action because Defendants have acted without statutory authority and the challenged actions are unlawful and *ultra vires.*

29.     The APA also authorizes judicial review of Defendants' actions because Defendants have acted contrary to law and without lawful authority, 5 U.S.C. § 706(2)(C), and arbitrarily, capriciously, and not in accordance with law. 5 U.S.C. § 706(2)(A).

30.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because the Labyrinth/Gemini Bridges TMA is situated entirely within the State of Utah.

## PARTIES

31.     The State of Utah is one of fifty sovereign states forming the United States of America, having been admitted to the Union on January 4, 1896, on an equal footing with the original states. The executive power of the State is vested in the Governor, who is responsible for seeing that the laws of the State are faithfully executed. Utah Const. art. VII, § 5; UTAH CODE ANN. § 67-1- 1.

32.     SITLA, as an agency of the State of Utah, administers and manages lands owned by the State for the benefit of Utah's public school systems.  Over 70 sections of land managed by SITLA are located within the Labyrinth/Gemini Bridges TMA.

33.     Defendant Deb Haaland is the Secretary of the DOI. In her official capacity, the Secretary is responsible for upholding the Constitution of the United States and for setting public land policy in accordance with the provisions and requirements of federal law, including FLPMA.

34.     Defendant DOI is the department of the federal government to which Congress delegated the authority to administer the public lands in accordance with the Constitution of the United States and federal law.

35.     Defendant Tracy Stone-Manning is the Director of the BLM.  In her official capacity, Director Stone-Manning is responsible for managing the public lands in accordance with the U.S. Constitution and federal law.

36.     Defendant Bureau of Land Management is the federal agency within DOI responsible for the management of public lands and minerals in Utah. The BLM manages approximately 22.9 million acres of federal surface and 23 million acres of mineral estate in Utah, including the Labyrinth/Gemini Bridges Transportation Management Area.

## PLAINTIFFS' INTERESTS AND STANDING

**A.     Plaintiffs are Participating Cooperating Agencies**

37.      The State of Utah, through the aforementioned state agency referred to as PLPCO, entered into a Cooperating Agency relationship with the BLM Moab Field Office through a Memorandum of Understanding dated February 16, 2019. *See* Exhibit #6. SITLA separately signed a Memorandum of Understanding with the BLM and participated as a separate Cooperating Agency. From that point on, the State of Utah, through both PLPCO and SITLA, regularly participated in the

BLM's in-person and virtual cooperating agency meetings, including a series of route evaluation meetings to discuss potential alternatives for each route under consideration in the Travel Management Plan. While the State was allowed to participate as a Cooperating Agency, all final decisions as to alternatives were made solely by the BLM.

38.     As the BLM initiated the public scoping process in the spring of 2021, the State submitted scoping comments in a letter dated April 26, 2021. *See* Exhibit #7. The State submitted confidential comments to the BLM as a Cooperating Agency in a letter dated December 10, 2021. *See* Exhibit #8. When the BLM released the preliminary Environmental Assessment for the Travel Management Plan, the State submitted comments on October 6, 2022. *See* Exhibit #9. Finally, after the BLM published its final DR, the Governor of Utah submitted the Governor's Consistency Review on October 25, 2023. *See* Exhibit #10.

**B.     Access to State-Owned Lands Managed by SITLA**

39.     Pursuant to the Utah Constitution, the State of Utah owns all property interests acquired from the United States at or after the time of statehood. UTAH CONST. Art. XX.

40.     The State of Utah holds fee title to approximately 70 sections of land within the Labyrinth/Gemini Bridges TMA that are administered and managed by SITLA, in trust, for the benefit of the public-school systems in the state ("Trust Lands"). Many of the roads within the TMA provide transportation and access to these Trust Lands and contribute to the financial viability of the public-school systems in the state.

41.     The BLM's DR closes and restricts access to two sections of Trust Lands owned by the State and managed by SITLA, which will result in an adverse economic impact on these lands. Those SITLA sections are located at Township 26 South, Range 18 East, Section 36 and Township 25 South, Range 18 East, Section 32. Access to these parcels is closed by the DR's closure of Hell Roaring Road, #1223 and Mineral Canyon Road, #1026. *See* Exhibit #11, Map of SITLA Parcels

With Access Blocked by DR.

42.     Although the DR does allow access to the extreme northwest corner of the SILTA parcel located at Section 32 of Township 25 South, Range 18 East, the extreme topography of the landscape renders access to the majority of the parcel impossible without access along Hell Roaring Road, #1223.  *Id.*

43.     The marketability and value of the affected Trust Lands will be significantly reduced. The closure of access roads severely limits the potential uses of these Trust Lands and their accessibility, thereby reducing their attractiveness to potential buyers or lessees. Continued access to these Trust Lands is paramount for fulfilling the intent of the original land grant from the United States.

44.     Specifically, the DR's closure of two roads providing exclusive access to two different SITLA parcels has resulted in loss of access or restriction of access to approximately 1,196 acres of Trust Lands owned by the State of Utah and managed by SITLA, which in turn will result in reduced marketability and diminished per-acre value by as much as fifty percent.

45.     In addition to the valuation loss, SITLA has very limited budgets for road maintenance. It is that way by design, to maximize disbursements of revenue. Therefore, it is imperative for the State, SITLA, and their Trust Lands beneficiaries that roads leading to SITLA Trust Lands be public; this allows SITLA to partner with the Grand County Road Department and others to improve or maintain the roads when needed.

46.     The United States may regulate the method and route of access to state school trust lands; however, that regulation cannot prevent the State or its lessee from gaining access to its land, nor may it be so prohibitively restrictive as to render the land incapable of full economic development. *State of Utah v. Andrus*, 486 F. Supp. 995 (D. Utah 1979) (commonly referred to as the *Cotter* Decision).

47.     BLM's DR violates the *Cotter* decision by cutting off access to two sections of State-owned SITLA Trust Land. All Trust Land parcels had motorized access prior to the DR, and many of them had multiple routes of motorized access. The DR effectively eliminates access, which will deprive the State and SITLA of the full economic value of the land, in violation of the law.

48.     The lack of available roads, even if they are only "paper routes" (routes that are only visible on maps but are reclaimed on the ground), will substantially impair actual access to the Trust Lands and increase the amount of time and financial capital necessary for prospective lessees to access those lands. This will render those parcels "incapable of full economic development." *Id*.

**C.     Transportation System Management and R.S. 2477**

49.     The State of Utah has regulatory authority over all motorized vehicle travel within its borders, including travel by ATVs, which constitutes a significant amount of the travel in the Labyrinth/Gemini Bridges TMA. See Utah Off-Highway Vehicle Act, Utah Code Ann. § 41-22-1 *et. seq*.

50.     The State and Grand County are joint owners of R.S. 2477 rights-of-way within Grand County, Utah. UTAH CODE ANN. §§ 72-5-302(2) (Supp. 2011) and -103(2)(b) (2004); *id*. at §§ 72-3-103(3) (2004) and -105(3).

51.     Approximately 114 of the 317.2 miles of roads and road segments closed by the BLM's DR are subject to R.S. 2477 rights-of-way jointly owned by the State of Utah and Grand County. The 114 miles now closed by the BLM are included in a quiet title action based upon R.S. 2477 currently pending before Judge Waddoups of this Court. *See Grand County v. United States of America,* Case No. 2:12-cv-00466-CW (D. Utah 2012), Dkt 2, paragraphs 212 through 11833.

**D.     Motorized Recreation and Access**

52.     It is in the interest of the State to promote outdoor recreation on federal land, including motorized recreation. See 2014 Utah State Comprehensive Outdoor Recreation Plan

("SCORP"). The SCORP identifies a need for more OHV facilities in Grand County. SCORP, at 36.

53.     The BLM is required under FLPMA to coordinate land use planning with statewide

outdoor recreation plans such as the SCORP. 43 U.S.C. §1712 (9).

54.     In Utah and Grand County, in particular, outdoor recreation activities such as those

engaged in by people who travel and recreate in the Labyrinth/Gemini Bridges contribute more than

$12 billion to the State's economy and employ more than 122,000 people. State of Utah Resource

Management Plan at 180 ("State RMP") (https://rmp.utah.gov/state-of-utah-resource-management-

plan/). In Grand County, travel and tourism constitute 48.9 percent of all jobs. *Headwaters*

*Economics 2024 Economic Profile System: Grand County, Utah - Travel and Tourism* (Available

online: https://headwaterseconomics.org/apps/economic-profile-system/49019 (last visited

05/22/2024)).

55.     The closure of roads by the DR in the Labyrinth/Gemini Bridges TMA will directly

impact all activities in a large area of Grand County and adversely affect economic and tax revenue

for the State.

56.     Local businesses that rent ATVs or offer guided tours to visitors provide employment

to local residents and tax revenue to the State. The State has an interest in the economic well-being of

their citizens. Motorized vehicle travel on the roads in the Labyrinth/Gemini Bridges TMA provides

access not only to federal public lands, but to private lands and State Trust Lands. This access is

important to the economy of the State.

**E.     Wildlife Management and Control**

57.     The United States Supreme Court has long recognized that states as sovereign entities

have the power and right to control and manage wildlife within their borders. *Greer v. Connecticut*,

161 U.S. 519 (1896).  This state ownership doctrine is still a legitimate basis for the exercise of state

authority.

58.     Pursuant to UTAH CODE §23A-1-102, all wildlife within the State of Utah, not held by private ownership, is the property of the State.  The State has primary responsibility for the management of wildlife within its borders and receives economic benefits from the issuance of hunting and fishing licenses and permits to outdoor sportsmen. *See generally* UDWR, Fiscal Year 2020 Financial Information, Utah Division of Wildlife Resources, *available at:* https://wildlife.utah.gov/dwr-financial-overview.html (2020), (last accessed September 29, 2021).

59.     The decreased access to the Labyrinth/Gemini Bridges TMA caused by BLM's DR and closure of roads challenged by this action diminishes and negatively affects the State's interest in and ability to manage wildlife.

## STATUTORY AND REGULATORY FRAMEWORK

### A.     R.S. 2477

60.     R.S. 2477 provides as follows: "And be it further enacted, That the right of way for the construction of highways over public lands, not reserved for public uses, is hereby granted." Act of July 26, 1866, ch. 262, § 8, 14 Stat. 251, 253, codified at 43 U.S.C. § 932, repealed by Federal Land Policy Management Act of 1976 (FLPMA), Pub. L. No. 94-579 § 706(a), 90 Stat. 2743.

61.     R.S. 2477 was an open congressional grant *in praesenti* of public highway rights-of-way for the benefit of miners, ranchers, homesteaders, and all other members of the public who had a need to travel across public lands.

62.     Acceptance and vesting of R.S. 2477 rights-of-way required no administrative formalities: no entry, no application, no license, no patent, and no deed on the federal side; no formal act of public acceptance on the part of the states or localities in whom the right was vested. See *Southern Utah Wilderness Alliance v. Bureau of Land Mgmt.*, 425 F.3d 735, 741 (10th Cir. 2005) (hereinafter "*SUWA v. BLM*"). R.S. 2477 operated as a standing offer of a right-of-way over the public domain, and the grant may be accepted without formal action by public authorities. *Id.*

63.     The congressional grant of public highway rights-of-way embodied by R.S. 2477 operated on unreserved public lands for 110 years until it was repealed on October 21, 1976, by FLPMA, 43 U.S.C. § 1701 *et. seq*.

64.     In repealing R.S. 2477, Congress preserved vested R.S. 2477 rights-of-way as valid existing rights and expressly directed the United States and its subordinate agencies (including the DOI and the BLM) to manage federal lands subject to these valid existing rights.

65.     Section 701(h) of FLPMA provides as follows: "All actions by the Secretary concerned under this Act shall be subject to valid existing rights." *Id*. § 1701, note; see also § 1769(a) ("Nothing in this subchapter shall have the effect of terminating any right-of-way or right of use heretofore issued, granted or permitted.").

**B.     The Wilderness Act**

66.     The Wilderness Act of 1964 was enacted "to secure for the American people of present and future generations the benefits of an enduring resource of wilderness." Management of these wilderness areas was to be done in "such manner as will leave them unimpaired for future use and enjoyment as wilderness." 16 U.S.C. § 1131(a).

67.      The Wilderness Act process for adding lands to the National Wilderness Preservation System ("NWPS") begins with recommendations to the President from the secretaries of either the Department of Agriculture or DOI. The President then makes a recommendation to Congress, which reserved to itself the power to designate wilderness. Specifically, the Wilderness Act states that "no Federal lands shall be designated as 'wilderness areas' except as provided for in this chapter or by a subsequent Act." *Id*.

68.      The Act defines wilderness as "an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain" and "an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvement or human

habitation." A qualifying area is defined as an area that:

> (1) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least five thousand acres of land or is of sufficient size as to make practicable its preservation and use in an unimpaired condition; and (4) may also contain ecological, geological, or other features of scientific, education, scenic, or historical value.

*Id*. § 1131(c).

## C.     The Federal Land Policy Management Act

69.     Congress enacted FLPMA, 43 U.S.C. § 1701–1787, to establish uniform and coherent administration of public lands. This Congressional mechanism includes (1) the creation of resource inventories and land use plans; (2) implementation of "multiple use" management plans; (3) management of lands recommended for inclusion in the NWPS as Wilderness Study Areas ("WSAs"); and (4) designation and management of Areas of Critical Environmental Concern ("ACECs") according to land use plans.

## 1.     Inventory and Land Use Plans

70.     Section 201 of FLPMA requires the Secretary of the Interior to "prepare and maintain on a continuing basis an inventory of all public lands and their resources and other values (including, but not limited to, outdoor recreation and scenic values), giving priority to areas of critical environmental concern." 43 U.S.C. § 1711(a). This inventory is to be kept current in order to reflect any changed conditions and to "identify new and emerging resource and other values." *Id.*

71.     In addition to the requirement to prepare an inventory, FLPMA requires that "[t]he preparation and maintenance of [the] inventory or the identification of such areas shall not, of itself, change or prevent change of management or use of public lands." *Id*. (emphasis added).

72.     Section 202 of FLPMA requires the Secretary of the Interior, with public participation, to "develop, maintain, and when appropriate, revise land use plans which provide by tracts or areas for the use of the public lands." *Id*. § 1712(a). In developing these land use plans, currently known as Resource Management Plans (or RMPs), the BLM must rely "on the inventory of

the public lands, their resources, and other values." *Id*. § 1712(c)(4).

73.     FLPMA also requires the Secretary of the Interior to "coordinate the land use inventory, planning, and management activities of or for such lands with the land use planning and management programs of . . . the State and local governments within which the lands are located…" *Id*. § 1712(c)(9).

74.     Moreover, the Secretary of the Interior:

shall provide for meaningful public involvement of State and local government officials, both elected and appointed, in the development of land use programs, land use regulations, and land use decisions for public lands, including early public notice of proposed decisions which may have a significant impact on non- Federal lands. Such officials in each State are authorized to furnish advice to the Secretary [of the Interior] with respect to the development and revision of land use plans [and] land use guidelines. . . for the public lands within such State and with respect to such other land use matters as may be referred to [the Secretary of the Interior] by them. *Id*.

**2.     Consistency with State and Local Land Use Plans**

75.     Under FLPMA, "[l]and use plans of the Secretary … shall be consistent with State and local plans to the maximum extent [the Secretary] find consistent with Federal law and the purposes of FLPMA."   43 U.S.C. § 1711(c)(9).

**3.     Multiple Use and Sustained Yield**

76.     As set forth in FLPMA, the guiding principle in the management of public lands generally, and the RMPs specifically, is multiple use and sustained yield. 43 U.S.C. § 1732(a).

77.     "Multiple use" is defined as "management of public lands and their various resources so that they are utilized in the combination that will best meet the present and future needs of the American people." *Id*. § 1702(c).

78.     These resources include, but are not limited to, "recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values." *Id*.

79.     "Sustained yield" is defined as "the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of various renewable resources of the public lands

consistent with multiple use." *Id*. § 1702(h).

80.     As set forth in FLPMA, the "principal or major uses" of public lands include and are limited to "domestic livestock grazing, fish and wildlife development and utilization, mineral exploration and production, rights-of-way, outdoor recreation, and timber production." *Id*. § 1702(l).

**4.     Wilderness Study Areas**

81.     Wilderness Study Areas, or WSAs, are those lands inventoried and identified by BLM as suitable for preservation as wilderness, subject to prior existing rights and uses. 43 U.S.C.§ 1782(c).

82.     Because the Wilderness Act does not directly address BLM's authority to designate or manage public lands as wilderness, FLPMA section 603 provides for a two-step inventory and management process.

83.     First, within fifteen years of October 21, 1976, passage of FLPMA, the Secretary of the Interior was to use the Section 201 Inventory to review "roadless areas of five thousand acres or more and roadless islands of the public lands." During that fifteen-year period, the Secretary of the Interior was required "from time to time [to] report to the President his recommendation as to the suitability or nonsuitability of each area or island for preservation as wilderness." *Id*. § 1782(a).

84.     On October 21, 1991, BLM's authority to review, recommend, create, or manage lands as WSAs terminated. *Id*.

85.     Second, the President was to advise Congress within two years of each report by the Secretary of the Interior of "his recommendations with respect to designation as wilderness of each such area", with the President's recommendations for wilderness designations becoming effective only if so provided by an act of Congress. *Id*. § 1782(b).

86.     As stated above, only Congress has the discretion to either designate WSA lands as part of the NWPS or to release them for other uses.

87.     Prior to congressional determination, management of recommended WSAs must be done in "a manner so as not to impair the suitability of such areas for preservation as wilderness," subject to prior existing rights and uses (the non-impairment standard). *Id.* § 1782(c).

88.     Pursuant to FLPMA section 302(b), BLM is to manage all other lands to the lesser "undue degradation" standard.

89.     On December 12, 1979, BLM issued an Interim Management Policy for Lands Under Wilderness Review ("IMP") to provide management guidance to BLM staff for section 603 WSAs pending congressional action.

**5.      Areas of Critical Environmental Concern**

90.     FLPMA defines Areas of Critical Environmental Concern ("ACECs") as "areas within the public lands where special management attention is required (when such areas are developed or used or where no development is required) to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources or other natural systems or processes, or to protect life and safety from natural hazards." 43 U.S.C. § 1702(a).

91.     Under FLPMA Section 201, the Secretary of the Interior must give priority to ACECs in the inventory of public lands. *Id.* § 1711(a).

92.     Under FLPMA Section 202, the designation and protection of ACECs are given priority in the development and revision of land use plans. *Id.* § 1712(c)(3).

93.     Prior to designating an ACEC, the BLM State Director must provide a 60-day period for public comment on the proposed designation. 43 CFR § 1610.7-2(b).

**6.      Rules and Regulations**

94.     To carry out the purposes of FLPMA, the Secretary of the Interior is required to promulgate rules and regulations. "The promulgation of such rules and regulations shall be governed by the provisions of chapter 5, title 5," the Administrative Procedures Act, 5 U.S.C. §§ 500-596. 43

U.S.C. § 1740.

95.     In 1971, DOI promulgated a rule to follow rulemaking procedures, even if the subject matter would fall within APA exceptions. Specifically, DOI stated that "[n]otice is hereby given of the policy of the Department of the Interior to give notice of proposed rulemaking and to invite the public to participate in rulemaking in instances where not required by law." 36 Fed. Reg. 8336 (May 4, 1971).

**D.      The National Environmental Policy Act**

96.     Congress enacted NEPA to "encourage the enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate health and welfare of man; to enrich the understanding of the ecological and natural resources important to the Nation…" 42 U.S.C. § 4321.

97.     To achieve these goals, NEPA requires federal agencies to prepare an environmental impact statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); see also 40 C.F.R. § 1501.4 and BLM NEPA Handbook, H-1790-1, 3.2.1 (Jan. 30, 2008) (discussing NEPA process).

98.     NEPA defines "major Federal actions" triggering NEPA analyses as "new or revised" agency "plans, policies, or procedures" including, as in the case of Order 3310, "formal documents establishing an agency's policies which will result in or substantially alter agency programs" and "which guide or prescribe alternative uses of Federal resources, upon which future agency actions will be based." 40 C.F.R. 1508.18(b)(1).

99.      The "human environment" is defined to "include the natural and physical environment and the relationship of people with that environment." 40 C.F.R. § 1508.14. Furthermore, when economic and social effects are interrelated with natural and environmental effects, "then the environmental impact statement will discuss all of these effects on the human

environment." *Id.*

100.     The EIS must "provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1. This open process of evaluation allows all stakeholders to know the implications of federal actions and to have the ability to participate and have their voices heard in the decision-making process.

**E.     Administrative Procedures Act.**

101.     Congress enacted the APA to standardize the way federal administrative agencies propose and establish rules and regulations. The APA also establishes a process for judicial review of agency decisions.

102.     The APA authorizes the setting aside of agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; in excess of statutory jurisdiction, authority, or limitations; without observance of procedures required by law, and unwarranted or unsupported by the facts. 5 U.S.C. 706(2). There must be a "rational connection between the facts found and the choice made." *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 56, 103 S. Ct. 2856, 2873, 77 L. Ed. 2d 443 (1983).

**1.     Rulemaking**

103.     Rulemaking procedures are clearly laid out in the APA and require both notice and the opportunity to comment. 5 U.S.C. § 553.

104.     Notice of proposed rulemaking is to be published in the Federal Register and must include "(1) a statement of the time, place, and nature of the public rule making proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved." *Id.* § 553(b).

105.     After providing notice, an agency must "give interested persons an opportunity to

participate in the rulemaking through submission of written data, views, or arguments with or without opportunity for oral presentation." *Id*. § 553(b)(3)(A).

106.    Except as otherwise required by statute, the APA provides an exception to the notice and comment requirements for "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice."

107.    Courts will overturn a rule purporting to exist under this exception if it was promulgated pursuant to a direct delegation of legislative power by Congress or "if it changes existing law, policy or practice." *Rocky Mountain Helicopters, Inc. v. F.A.A.*, 971 F.2d 544, 546 (10th Cir. 1992).

**2.    Judicial Review**

108.    The APA also establishes a procedure for judicial review for those who are suffering a legal wrong as the result of a final agency action and have no other adequate remedy. *Id*. § 704.

109.    The reviewing court may decide "all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." *Id*. § 706.

110.    The court shall, among other things "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right . . . [or] without observance of procedure required by law." Id. § 706(2)(A) and (C)-(D).

**F.    National Historic Preservation Act**

111.    Congress enacted the National Historic Preservation Act ("NHPA") to preserve historic and archaeological sites in the United States.  54 U.S.C. § 100101.  Section 106 of the NHPA requires federal agencies with jurisdiction over a proposed federal undertaking to consider the effect

of that undertaking on any historic property.  54 U.S.C. § 306108.

112.    Regulations at 36 C.F.R. § 800 Part B provide specific procedures for complying with the NHPA.

113.    Further regulations at 36 C.F.R. §60.4 stipulate that a cultural resource—object, site, structure, building, or district—must possess integrity of location, design, setting, materials, workmanship, feeling, and association.

114.    36 C.F.R. §60.4 also provides criteria for evaluation under the National Register for Historic Places.  These regulations describe National Register-eligible historic properties as: (a) "… associated with events that have made a significant contribution to the broad patterns of our history; or (b) … associated with the lives of persons significant in our past; or (c) … embody the distinctive characteristics of a type, period, or method of construction, or that represent the work of a master, or that possess high artistic values, or that represent a significant and distinguishable entity whose components may lack individual distinction; or (d) … have yielded, or may be likely to yield, information important in  prehistory or history". 36 C.F.R. §60.4(a)-(d).

115.    These regulations require the BLM to seek information from "consulting parties", such as state governments, likely to have knowledge of, or concerns with, historic properties in the area, and identify issues relating to the undertaking's potential effects on historic properties.  36 C.F.R. § 800.4(a)(3).

## GENERAL ALLEGATIONS

**A.    Interference With Utah's Ongoing R.S. 2477 Litigation in Grand County**

116.    To date, Plaintiff has conducted preservation depositions with thirty witnesses in Grand County, thirteen of whom have specifically testified as to their use of R.S. 2477 roads closed

under this TMP.[3]  These witnesses testified that prior to October 1976 they all used at least one of the claimed R.S. 2477 roads closed by Federal Defendant's DR.  Broadly speaking, their testimonies describe a variety of public uses occurring on these roads in the 1960s and 1970s, including driving these roads for purposes of hunting, cattle ranching, picnicking, recreational exploring, mineral prospecting, and other activities.

117.    Witness testimony detailed the pre-October 1976 conditions of the roads, including the roads' width and the frequency of travel by members of the public along the roads.  Many witnesses described in detail the types of vehicles they drove on these roads prior to October 1976. The combined testimony of the thirteen preservation witnesses illustrates frequent public use of the claimed R.S. 2477 roads in the Labyrinth/Gemini Bridges area prior to October 1976.

118.    The State continues to find fact witnesses in Grand County and conduct preservation depositions.  The State expects to conduct more preservation depositions with fact witnesses who have personal pre-October 1976 experience using the 114 miles of claimed R.S. 2477 roads closed in Defendant's DR.  Like the thirteen depositions already conducted, the State expects to receive strong additional evidence of the pre-October 1976 continuous public use of these roads in future depositions.

119.    In *Kane County v. United States,* No. 2:08-cv-00315, 2013 WL 1180764 (D. Utah, March 20, 2013)(affirmed in part and reverse in part)(commonly known as *Kane 1*), this Court examined the testimony provided by numerous witnesses who had traveled on R.S. 2477 roads claimed by the State and Kane County.[4]  Pulling information from the deposition testimony, the Court listed a multitude of public uses that convincingly demonstrated that the roads had been accepted by

---

[3] The State has included a detailed summary of public uses for each claimed R.S. 2477 road in the Travel Management Area in Exhibit #12.

[4] Although *Kane 1* was remanded by the Tenth Circuit on the question of scope, in *Kane County v. United States* 772 F.3d 1205 (10th Cir. 2014), the Tenth Circuit did not reverse this Court's finding on the matter of title or the elements of public use that contributed to plaintiffs establishing a right-of-way to certain roads under R.S. 2477.

public recognition and used for the required period, thus constituting valid R.S. 2477 roads.  *Id*, at 46, 53, 66.

120.     The public uses listed by this Court in *Kane 1* as evidence of public recognition and use included:  camping, picnicking, exploring, sightseeing, gathering firewood, hunting, fishing, accessing adjacent private land, logging, looking for historic artifacts, visiting historic points of interest, accessing hiking locations, moving cattle, traveling to family reunions, guiding hunting groups, mineral exploration, and other uses. *Id* at 24, 27-28, 31, 33, 46, 50, 53.  This Court also weighed whether a road had a historical reputation as existing, whether the road accessed private property, whether the public was ever precluded from using the road, whether the road connected to other roads, whether the road was maintained upon request, and whether the road was considered a public road (rather than a private lane). *Id*, at 44, 49, 50, 51, 54.

121.     This Court specifically considered whether the public was able to travel the full length of the road as often as it found it convenient or necessary, and determined that infrequent use did not disqualify the State and County's claims if the frequency of use was compatible with the road's purpose. *Id*, at 49.

122.     This Court did not find any one of these public uses to be dispositive, but listed them as factors, that in combination with other public uses continuing for a period of a least ten years prior to October 1976, constituted acceptance by public recognition and use.  *Id*, at 50.   As a result, the Court quieted title to Kane County and the State of Utah for many of the roads at issue in *Kane 1*. *Id*, at 66.

123.     In the State's pending Grand County R.S. 2477 case addressing the 114 miles of closed R.S. 2477 roads, the thirteen individual fact witnesses who have participated in preservation depositions have provided substantial evidence of public use of roads closed by the BLM's DR.  The types of public uses testified to include many of the same public uses that this Court used to quiet title

in favor of the State and Kane County in *Kane 1*.

124.    Speaking generally, the thirteen witnesses have testified to using the claimed R.S. 2477 roads within the TMA for public uses such as camping, exploring, sightseeing, gathering firewood, hunting, accessing adjacent private land, looking for historic artifacts, visiting historic points of interest, accessing hiking locations, moving cattle, mineral exploration, and other uses.  *See* Exhibit #12, Summary of Deposition Testimony for Claimed R.S. 2477 Roads Closed by Labyrinth/Gemini Bridges Travel Management Plan Decision Record.  The fact witnesses generally testified to continuous public use prior to the October 1976 repeal of R.S. 2477, and also testified that the disputed roads served as public thoroughfares used by the community (as opposed to private lanes). *Id*.

125.    The BLM's interference in the State's discovery process violates the long-established common-law principle of "spoilation of evidence," which the 10th Circuit Court of Appeals has defined as "encompass[ing] a third party's intentional or negligent destruction or loss of tangible evidence, which destruction or loss impairs a person's ability to prove or defend a prospective civil action."  *Talmadge v. State Farm Mut. Auto. Ins. Co*., 107 F.3d 21 (10th Cir. 1997).  Similarly, the Stanford Journal of Complex Litigation has found "[t]he unanimous view of the federal courts is that federal law imposes upon a party a duty to preserve relevant evidence[.] ... Furthermore, it is well accepted that the federal courts have authority to protect the integrity of their proceedings by sanctioning parties who spoliate evidence after an action has commenced."  Joshua M Koppel, Federal Common Law and the Courts' Regulation of Pre-Litigation Preservation, 1 STANFORD JOURNAL OF COMPLEX LITIGATION 102 (2012).   Here, the BLM's prohibition on motorized vehicle use on roads subject to the State's pending Quiet Title action is an intentional masking of tangible evidence, which now impairs the State's ability to prove its claims in an ongoing civil action. Simply put, counsel for the State needs to drive on these roads with their fact witnesses as its method

27

of collecting evidence, and the BLM's closure of these roads bars the collection of this evidence.

126.     Defendants' closure of these roads to motorized traffic will also increase the rate at which these roads are naturally reclaimed through vegetation growth.  The R.S. 2477 roads closed by the BLM's DR are largely maintained through "maintenance by use," the process by which regular vehicular traffic minimizes vegetation growth in the roadway and keeps the road passable to future motorists.  Closure of these roads to motorized traffic will initiate this natural reclaiming process, further impairing the State's ability to collect evidence and prove its claims in the ongoing action.

127.     Unable to conduct discovery on the roads closed by the DR, Plaintiffs have been significantly harmed by Defendant's DR.

128.     It is the ordinary practice of Plaintiff to drive the length of claimed R.S. 2477 roads with preservation witnesses prior to conducting depositions.  Driving the length of the claimed R.S. 2477 roads is essential for allowing the witnesses to provide high-quality testimony during the depositions by refreshing recollections from decades ago.  This aspect of Plaintiff's discovery process is now prohibited by the Defendant's DR, resulting in irreparable harm to the State. Additionally, many (if not all) of the State's preservation witnesses are elderly.  These witnesses need to be able to travel these roads immediately while they are still physically able to do so.  Federal Defendant's DR blocks the State's preparation process and makes deposition testimony on these roads much more difficult, while reducing the depositions' evidentiary value.  Furthermore, Plaintiff's counsel and witnesses could now face arrest and prosecution for even driving these claimed R.S. 2477 roads that the Federal Defendants have unilaterally closed.

129.     After the State filed its Grand County R.S. 2477 lawsuit in 2012, as well as similar lawsuits against the BLM in twenty-one other counties, this Court issued a Consolidated Case Management Order ("CMO") to consolidate the discovery process for the twenty-two R.S. 2477 lawsuits.  *See* Consolidated Case Management Order, *Rich County et al v. U.S.A. et al.,* Case 2:12-cv-

00424-CW, Docket No. 50.  While these cases, including the Grand County R.S. 2477 case, are currently stayed pending the resolution of a Bellwether case in Kane County, this Court has provided for the State to conduct preservation depositions to preserve the testimony of fact witnesses "whose testimony is at a substantial risk of loss due to advanced age, infirmity, or permanent relocation outside the state." *Id.*   Once a potential witness passes away, their memories of using these roads prior to October 1976 are lost with them.  The harm caused by the Defendant's DR is thus an irreparable harm rather than a transitory one.

130.    As witnesses must be at least sixty years old per the CMO, and as many are much older, there is a tremendous risk of witnesses passing away within the next decade.  Indeed, many potential witnesses for this case (and other R.S. 2477 cases around Utah) have passed away prior to Plaintiff's attorneys having the opportunity to conduct preservation depositions with them.  This problem will only grow more acute with the passage of time as we move further away from October 1976.

131.    The inability to travel on the roads will harm the quality of the State's depositions.  Low quality depositions harm the State's case and lower the quality of evidence the Court will consider in making its decisions.

**B.  Closure of Access to SITLA Lands**

132.    The DR closes access to two sections of Trust Lands owned by the State of Utah and managed by SITLA. Continued access to these sections of Trust Lands is paramount for fulfilling the intent of the original land grant from the United States.

133.    The United States may regulate the method and route of access to state school trust lands; however, that regulation cannot prevent the State or its lessee from gaining access to its land, nor may it be so prohibitively restrictive as to render the land incapable of full economic development. *Cotter* Decision).

134.    The DR violates the *Cotter* decision by cutting off access to two sections of SITLA Trust Land. All of the parcels had motorized access prior to the DR, and many of them had multiple routes of motorized access. The DR effectively eliminates access, which will deprive the State of the full economic value of its land, in violation of the law.

135.    The lack of available roads, even if they are only "paper routes" (*i.e.*, routes that are only visible on maps but are reclaimed on the ground), will substantially impair actual access and increase the amount of time and financial capital necessary for prospective lessees to access those lands. This will undoubtably render those parcels "incapable of full economic development."

136.    FLPMA requires the BLM to manage public lands according to multiple use and sustained yield principles in order to "meet the present and future needs of the American people." *See* 43 U.S.C. 1701(a)(7), and 1702(c). These uses include domestic livestock grazing, which is defined as a "principal or major use." *Id*. at (1).

137.    Many of the routes that were closed in the DR considered only conservation and failed to take into account livestock grazing, recreation, and other multiple uses.

138.    Keeping existing routes open helps accomplish the goal of "minimization of conflicts among various uses of the public lands." 43 C.F.R. § 8342.1. Transportation connectivity reduces in and out traffic and can spread out use. Additionally, keeping roads open provides the traveling public access while reducing the need and desire to pioneer new and unauthorized routes.

139.    The DR violates FLPMA by failing to manage the public lands according to the standards set forth in the immediately preceding paragraphs.

**C.      Failure to Provide Consistency Review with Utah State Land Management Plans**

140.    Under FLPMA, when developing or creating Resource Management Plans, the BLM is required to coordinate its land use inventory, planning, and management activities for such lands with the land use planning and management programs of the states within which the lands are located.  43

U.S.C.A. § 1712(c)(9).

141.    The BLM also is required in the development of land use plans to ensure that

consideration is given to the applicable state, local, and tribal plans "and to resolve, to the extent

practical, inconsistencies between Federal and non-Federal Government plans." *Id.*

142.    FLPMA further mandates that BLM land use plans "shall be consistent with state and

local plans to the maximum extent [the Agency] finds consistent with federal law and the purposes of

this Act." *Id.*

143.    In addition to the coordination and consistency requirements, CEQ regulations

require federal agencies to discuss the conflicts between the proposed action and the objectives of

state and local plans. 40 CFR § 1502.16.

144.    The State of Utah has a duly adopted resource management plan. Utah State Resource

Management Plan, ("Utah SRMP"), *available at:*

https://storymaps.arcgis.com/collections/81d4406668e34acca4d98275ee41cd07?item=1(2022).

145.    The Utah SRMP includes locally adopted objectives and policies for federal land

management and includes findings, provisions, and policies relating to natural resource development

and environmental quality relevant to the current planning process.

146.    In addition to the Utah SRMP, UTAH CODE § 63J-8-104(h)(i)  also establishes the

State's position that BLM land-use plans should "keep open to motorized travel, any road in the

subject lands that is part of the respective counties' duly adopted transportation plan."  BLM has

failed to follow the provisions of FLPMA; its DR is inconsistent with the Utah SRMP, and BLM

completely failed to discuss these inconsistencies or make any attempt to resolve them.

147.    The State's position is that travel management decisions are the core management

decision upon which many other BLM decisions rest.  Implementation-level decisions for recreation,

livestock grazing, resource extraction, and many other uses of BLM land revolve around the decisions

made in BLM TMPs.  Thus, the State finds that BLM TMPs qualify as BLM "land use plans" as intended by FLPMA.  BLM regulations also allow the governor of the involved state to review BLM land use plans and evaluate them for consistency with state and local plans.  A governor may then submit a "Governors Consistency Review" letter to the BLM. See 43 C.F.R. § 1610.3-2(e).

148.     Accordingly, on October 25, 2023, Utah Governor Spencer J. Cox submitted a Governor's Consistency Review letter concerning the Labyrinth/Gemini Bridges TMP to the BLM State Office.  The Governor's letter explained the inconsistencies between the BLM's Labyrinth/Gemini Bridges TMP and corresponding State plans.  See Exhibit #10, Governor's Consistency Review letter, at 1.  On November 27, 2023, BLM Utah State Director Greg Sheehan responded with a letter stating that the Labyrinth/Gemini Bridges TMP, despite its name, is an "implementation-level" decision rather than a land use plan under FLPMA, and thus the BLM could not accept or respond to the Governor's Consistency Review.

149.     The BLM has failed to explain why a travel management plan falls beyond the scope of "land use plans" under FLPMA and thus evades the BLM's consistency review requirements under 43 C.F.R. § 1610.3-2(e).

**D.     Failure to Evaluate R.S. 2477 Roads for National Register of Historic Places and Assess Effects**

150.     R.S. 2477 roads must be at least fifty years old, as a road must have been in existence and used by the public for a minimum of ten years prior to October 1976.  Thus, as roads that are at least fifty years old, R.S. 2477 roads themselves may be eligible for nomination to the National Register of Historic Places and are subject to archaeological recording for the purpose of determining National Register of Historic Places eligibility.  36 C.F.R. §800.4(a)(3). Historical roads, just like other types of cultural resources, are eligible for National Register inclusion if they possess certain aspects of integrity and meet one of more of the four National Register criteria for evaluation. 36 C.F.R. §60.4.

151.    Concerning integrity, 36 C.F.R. §60.4 stipulates that a cultural resource—object, site, structure, building, or district—must possess integrity of location, design, setting, materials, workmanship, feeling, and association. In applying the criteria for evaluation, a federal agency may find that it is critical for a user-created, two-track road to possess the aspects of location, setting, feeling, and association to convey significance, while the aspects of materials and workmanship are unnecessary or irrelevant to conveying significance.

152.    The regulation further requires that a cultural resource is: (a) "… associated with events that have made a significant contribution to the broad patterns of our history; or (b) … associated with the lives of persons significant in our past; or (c) … embody the distinctive characteristics of a type, period, or method of construction, or that represent the work of a master, or that possess high artistic values, or that represent a significant and distinguishable entity whose components may lack individual distinction; or (d) … have yielded, or may be likely to yield, information important in  prehistory or history". 36 C.F.R. §60.4(a)-(d).

153.    R.S. 2477 roads that are eligible for inclusion in the National Register of Historic Places would then be considered "historic properties" under Section 106 of the National Historic Preservation Act. 54 U.S.C. § 306108.   During the BLM's development of the Labyrinth/Gemini Bridges TMP, the State urged the BLM to record the R.S. 2477 roads during its archaeological surveys and evaluate them for National Register of Historic Places eligibility per the National Register criteria for evaluation. *See* 36 C.F.R. §60.4 above. The State also urged the BLM to assess how closure of the National Register-eligible R.S. 2477 roads could adversely affect those historic properties and to seek ways to avoid, minimize, or mitigate adverse effects to those historic properties pursuant to 36 C.F.R. §800.6.  However, the BLM failed to do so.

154.    Closing an R.S. 2477 road (that is eligible for the National Register of Historic Places) to motorized traffic may have adverse effects on the historic character of the R.S. 2477 road.

Adverse effects occur when an undertaking, such as the closure of a National Register-eligible road, "may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the National Register in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling or association" [36 C.F.R. §800.5(a)(1)]. Closure of a historic R.S. 2477 road may cause an adverse effect by diminishing the integrity of one or more of these seven aspects. For example, closure may amount to neglect and deterioration of the historic property (36 C.F.R. §800.5(a)(2)(vi)), and natural reclaiming of the road due to lack of use may "change the character of the property's use or physical features that contribute to its historic significance" (36 C.F.R. §800.5(a)(2)(iv)).

155.    In addition to being a Cooperating Agency, the State was also a "Consulting Party" to the BLM's Labyrinth/Gemini TMP's Section 106 process.  As a consulting party, the State explained to the BLM that R.S. 2477 roads are cultural resources that may be eligible for nomination to the National Register of Historic Places in a letter dated April 11, 2023.  *See* Exhibit #13, Section 106 Consultation Letter.   The State provided the BLM with locational information about each R.S. 2477 road within the Labyrinth/Gemini Bridges TMA and explained why these roads should be included in the Section 106 process by citing some specific examples, such as Hey Joe Canyon Road (County Road #1527).   In spite of the State's engagement in the Section 106 process, the BLM ignored R.S. 2477 roads as cultural resources that were (1) located directly in the archaeological survey areas for the TMP (2) identified by the State (in its capacity as a Section 106 consulting party) that provided locational information and a rationale for including these cultural resources, (3) qualified as a type of cultural resource that must be recorded per BLM's own standards and guidelines and by agreement documents between the agency and the Utah State Historic Preservation Office, and (4) when eligible for National Register inclusion, assessed for effects.  By failing to consider these recommendations by the State in its role as a Section 106 consulting party, and by

ignoring its own guidance, the BLM has failed to complete the Section 106 process for the Labyrinth/Gemini Bridges TMP.

**E.     Conflict of Interest by BLM Principal Deputy Director**

156.    The 2017 SUWA Settlement Agreement, which required the BLM to develop the Labyrinth/Gemini Bridges TMP, was signed by several plaintiffs, including The Wilderness Society. *See* Exhibit #5, at 33.

157.    The Wilderness Society was represented by the "Senior Counsel and Director" for its "BLM Action Center." *Id*.

158.    That individual was appointed as the BLM's Deputy Director for Policy and Programs in February 2021.  She was later promoted to the BLM's Principal Deputy Director.

159.    The State possesses information and belief that, despite being a plaintiff signatory to the 2017 SUWA Settlement Agreement, the BLM's Principal Deputy Director has not recused herself but has instead been directly involved in the development of the BLM's DR for the Labyrinth/Gemini Bridges TMP.

<u>**CLAIMS FOR RELIEF**</u>

<u>**FIRST CAUSE OF ACTION**</u>
*Violation of the APA: Unlawful Arbitrary and Capricious Action*

160.    Plaintiffs reallege and incorporate by reference all allegations contained in paragraphs 1 through 159.

161.    The Administrative Procedures Act authorizes the setting aside of agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; in excess of statutory jurisdiction, authority, or limitations; without observance of procedures required by law, and unwarranted or unsupported by the facts. 5 U.S.C. 706(2). There must be a "rational connection between the facts found and the choice made." *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 56, 103 S. Ct. 2856, 2873, 77 L. Ed. 2d 443 (1983).

162.      As set forth in detail above in paragraphs 60 through 65 and 116 through 131, a thorough analysis of specific facts underlying BLM's decision reveals that the BLM acted arbitrarily and capriciously in closing 114 miles of roads subject to the State of Utah's pending Quiet Title action, *Grand County v. United States*, 2:12-cv-00466-CW.

163.      As alleged above, BLM's DR, which closes 114 miles of roads subject to Plaintiffs' pending Grand County R.S. 2477 case will impair Plaintiffs' ability to conduct discovery for the roads subject to the pending Quiet Title lawsuit.

164.      As alleged above, driving on the roads with fact witnesses is an essential part of Plaintiffs' established discovery process, an action now prohibited on 114 miles of claimed roads under the BLM's DR.

165.      As alleged above, closure of roads subject to Plaintiffs' pending Grand County R.S. 2477 Quiet Title lawsuit will increase the rate at which vegetation naturally grows in the roadbed, obscuring evidence of the roads' existence and condition.  This process of natural reclamation by vegetation growth further deteriorates evidence critical to Plaintiffs' pending Quiet Title lawsuit.

166.      BLM's DR is arbitrary, capricious, and contrary to law in violation of the APA, 5 U.S.C. § 706 for materially interfering with Plaintiffs' discovery process and causing the deterioration of evidence central to the Plaintiffs' ongoing Grand County R.S. 2477 litigation.

## SECOND CAUSE OF ACTION
*Violation of Federal Case Law: Diminished Access to State-owned Land managed by SITLA*

167.      Plaintiffs reallege and incorporate by reference all allegations contained in paragraphs 1 through 166.

168.      As alleged above in paragraphs 39 through 48 and 132-139, BLM's DR closes access to two sections of property owned by the State of Utah and administered by SITLA, which will result in a direct adverse economic impact. Specifically, BLM's DR will result in loss of access or

restriction of access to thousands of acres of property, which in turn will result in reduced marketability and diminished per-acre value by as much as fifty percent.  The collective loss of the value of these lands will be in the hundreds of thousands of dollars.

169.    Continued access to these sections is paramount for fulfilling the intent of the original land grant from the United States. The closure of access roads severely limits the potential uses of these lands and their accessibility, thereby reducing their attractiveness to potential buyers or lessees.

170.    The United States may regulate the method and route of access to state school trust lands; however, that regulation cannot prevent the state or its lessee from gaining access to its land, nor may it be so prohibitively restrictive as to render the land incapable of full economic development. *State of Utah v. Andrus*, 486 F. Supp. 995 (D. Utah 1979) (commonly referred to as the *Cotter* Decision).

171.    BLM's DR violates the *Cotter* decision by cutting off and diminishing access to two sections of lands owned by the State of Utah and administered by SITLA.

172.    Those sections had motorized access prior to the DR and many of them had multiple routes of motorized access. The DR effectively eliminates access, which will deprive the State and SITLA of the full economic value of their land, in violation of the law.

173.    The lack of available roads, even if they are only "paper routes" (*i.e.*, routes that are only visible on maps but are reclaimed on the ground), will substantially impair actual access to those parcels and increase the amount of time and financial capital necessary for prospective lessees to access those lands, which will undoubtedly render those lands "incapable of full economic development." *Id.*

### **THRID CAUSE OF ACTION**
*Violation of FLPMA: Failure to Provide render TMP Consistent with Utah Land Management Plans or Provide Opportunity for Governor's Consistency Review*

174.    Plaintiffs reallege and incorporate by reference all allegations contained in

paragraphs 1 through 173.

175.    As alleged in paragraphs 69 through 75 and 140-149, the BLM's TMP and DR are not consistent with the State's duly adopted Resource Management Plan.

176.    FLPMA requires the BLM to develop "land use plans" to govern the management and use of BLM lands. 43 U.S.C. § 1712(a).

177.    FLPMA requires that BLM land use plans be "consistent with State and local plans to the maximum extent [the Secretary of Interior] finds consistent with Federal law and the purposes of [FLPMA]." 43 U.S.C. § 1712(c)(9).

178.    Regulations implementing FLPMA require the BLM to provide state governors with the opportunity to submit a "Governor's Consistency Review" of a BLM land use plan, and further require the BLM to consider and analyze the Governor's recommendations. 43 C.F.R. § 1610.3-2(e).

179.    The BLM denies that travel management plans are "land use plans" under FLPMA, and therefore alleges that the FLPMA requirements of 43 U.S.C. § 1712(c)(9) or the regulatory requirements of 43 C.F.R. § 1610.3-2(e) do not apply to travel management plans.

180.    The BLM has not justified its reasoning that travel management plans are merely "implementation level decisions" that do not fall under the auspices of FLPMA land use plans.

181.    The BLM has violated FLPMA and its implementing regulations by not seeking consistency between its DR and the State Resource Management Plan, and by failing to provide the Governor of Utah with the formal opportunity to submit a Governor's Consistency Review of the DR.

### FOURTH CAUSE OF ACTION
*Violation of FLPMA: Failure to comply with Multiple Use and Sustained Yield Mandate*

182.    Plaintiffs reallege and incorporate by reference all allegations contained in paragraphs 1 through 181.

183.    As alleged in paragraphs 76-80, under FLPMA, the guiding principle in the management of public lands generally, and the RMPs specifically, is multiple use and sustained yield.

43 U.S.C. § 1732(a).

184. "Multiple use" is defined as "management of public lands and their various resources so that they are utilized in the combination that will best meet the present and future needs of the American people" *Id*. § 1702(c).

185. These resources include, but are not limited to, "recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values." *Id*.

186. "Sustained yield" is defined as "the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of various renewable resources of the public lands consistent with multiple use." *Id*. § 1702(h).

187. FLPMA requires the BLM to manage public lands according to multiple use and sustained yield principles, in order to "meet the present and future needs of the American people." See 43 U.S.C. § 1701(a)(7), and § 1702(c). These uses include domestic livestock grazing, which is defined as a "principal or major use." *Id*. at (1).

188. The BLM's DR closed roads based upon a rationale that only considers conservation and fails to take into account livestock grazing, wildlife management, motorized recreation and travel and other uses.

189. Keeping existing routes open helps accomplish the goal of "minimization of conflicts among various uses of the public lands." 43 C.F.R. § 8342.1. Transportation connectivity reduces in and out traffic and can spread out use. Additionally, keeping roads open provides the traveling public access while reducing the need and desire to pioneer new and unauthorized routes.

190. BLM's DR violates FLPMA by failing to manage the public lands of the Labyrinth/Gemini Bridges TMA in accordance with principles of multiple use and sustained yield and is arbitrary, capricious, and otherwise not in accordance with law in violation of the APA. 5 U.S.C. § 706.

**FIFTH CAUSE OF ACTION**
*Violation of FLPMA and other Federal Statutes: Unlawful De Facto Wilderness Management on Non-WSA Lands*

191.     Plaintiffs reallege and incorporate by reference all allegations contained in paragraphs 1 through 190.

192.     Constitutional authority to classify and manage public lands resides with Congress. United States Constitution, Article IV, Section 3 cl. 2. In various federal laws, including but not limited to the Taylor Grazing Act ("TGA"), 43 U.S.C. §§315-315q, FLPMA, 43 U.S.C. §§1701 *et seq.*, the 1872 Mining Law, as amended, 30 U.S.C. §§20, *et seq.*, and the Mineral Leasing Laws ("MLA"), 30 U.S.C. §§181, *et seq.*, Congress has delegated its constitutional authority to Defendants to manage public lands. This delegated authority is defined and limited by the terms of the respective federal statute.

193.     While the BLM's DR closing 317.2 miles of roads in the Labyrinth/Gemini Bridges TMA does not use the term "wilderness" to define its protective management of non-WSA lands, there is no question that the practical effect is to create WSA-type management.

194.     As set forth above in paragraphs 66 through 68 and 81-95, BLM's wilderness review authority under §603 of FLPMA, 43 U.S.C. §1782(c), has terminated, and as a result, BLM must "not manage or otherwise treat public lands, other than §603 WSAs. . . as WSAs or as wilderness pursuant to the [FLPMA] §202 process."

195.     BLM may not create §202 WSAs and may not "treat" public lands as WSAs  through its land use and transportation management planning processes. The BLM's DR unlawfully treats the non-WSA lands of the Labyrinth/Gemini Bridges TMA as a *de facto* WSA lands.

196.     Notably, FLPMA does not preclude individual protections associated with the concept of wilderness that may be afforded through the land use planning process, such as through the establishment of ACECs. 43 U.S.C. §1702(a). In doing so, specific statutory and regulatory criteria

must be met, including a finding that special management attention is required to prevent irreparable damage. *Id.* Proposed ACEC designations are not a substitute for a wilderness suitability determination, nor may they be offered as a means to manage non-WSA lands as wilderness.

197.    When appropriate, BLM may also limit OHV use or establish mitigation measures, stipulations, or conditions of use to be attached to permits, leases, and other authorizations to avoid or minimize impacts to individual resource values. BLM, however, may not use the land or transportation management planning process to create *de facto* wilderness similar to the management of WSAs to the exclusion of multiple use.

198.    BLM's reconsideration and DR treat the area of the newly closed roads as if they were WSAs and violates any sound and legally supported interpretation of FLPMA and other federal statutes.

199.    Defendants have acted arbitrarily and capriciously in issuing the BLM's DR and have closed 317.2 miles of roads and road segments because they traverse lands considered by SUWA and other environmental groups to be a *de facto* Red Rock Wilderness similar to what has been proposed under the Red Rock Wilderness Act.  *See* Exhibit #4. A favorable decision from this Court will redress the legal injuries to Grand County, the State of Utah and SITLA and remove immediate barriers to multiple use of the affected public lands, including access to lands owned by the State and managed by SITLA, wildlife management, transportation management and livestock grazing, and support key components of the State's and County's land use and transportation plans. Such a determination and permanent injunction will leave the Utah wilderness debate where it belongs as provided for by law, with the United States Congress.

## SIXTH CAUSE OF ACTION
*Violation of NHPA Section 106 Regulations: Failure to Evaluate R.S. 2477 Roads for National Register of Historic Places Eligibility and Assess Effects*

200.    Plaintiffs reallege and incorporate by reference all allegations contained in paragraphs

1 through 199.

201.     As alleged above in paragraphs 111 through 115 and 150-155, the federal regulations implementing Section 106 of the NHPA provide procedures for the BLM to meet its requirement to evaluate cultural resources for National Register eligibility and assess effects of National Register-eligible properties.

202.      The BLM failed to evaluate historical R.S. 2477 roads within the Labyrinth/Gemini Bridges TMA as cultural resources eligible for National Register of Historic Places consideration. Consequently, the agency also failed to assess effects to R.S. 2477 roads that are eligible for National Register inclusion.

203.     The State, acting as a Section 106 Consulting Party, submitted documentation of its knowledge and concerns to the BLM that R.S. 2477 roads within the Labyrinth/Gemini Brides TMA are cultural resources at least fifty years old, are eligible for National Register of Historic Places evaluation, and, if eligible for National Register inclusion, may be adversely affected by the TMP.

204.     Despite the State submitting this documentation, the BLM still did not take any action to evaluate R.S. 2477 roads for National Register of Historic Places eligibility and assess effects to those roads eligible for National Register inclusion.

205.     The BLM has violated the implementing regulations of Section 106 of the NHPA by arbitrarily and capriciously failing to evaluate R.S. 2477 roads for National Register of Historic Places eligibility and assess effects to National Register-eligible roads, despite the specific request by a Section 106 Consulting Party to do so.

## SEVENTH CAUSE OF ACTION
*Violation of the APA: Unlawful Arbitrary and Capricious Conflict of Interest*

206.     Plaintiffs reallege and incorporate by reference all allegations contained in paragraphs 1 through 205.

207.     As alleged above in paragraphs 156 through 159, the signatory for one of the plaintiffs in the 2017 SUWA Settlement Agreement (the document requiring the BLM to initiate the Labyrinth/Gemini Bridges TMP) now serves as the Principal Deputy Director for the BLM.

208.     It is the information and belief of the State that the BLM's Principal Deputy Director has been directly involved in the development of the Labyrinth/Gemini Bridges TMP and the decision-making process leading to the final decision in the BLM's DR.

209.     BLM acted arbitrarily, capriciously, and contrary to law, in violation of the APA, 5 U.S.C. § 706, by allowing its Principal Deputy Director to participate in the decision-making process for the Labyrinth/Gemini Bridges TMP and DR despite her pervious involvement as counsel for a plaintiff environmental organization in the 2017 SUWA Settlement Agreement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court grant relief against Defendants as follows:

1.     Declare and set aside the DR as unlawful and find that Defendants' closure of 114 miles of roads subject to Plaintiff's pending Quiet Title action arbitrarily and capriciously interferes with the Plaintiffs' discovery process and ability to collect evidence in its ongoing Grand County R.S. 2477 lawsuit.

2.     Declare unlawful and set aside the DR because it deprives the State and SITLA of legally protected access to State-owned Trust Lands administered by SITLA.

3.     Declare and set aside BLM's DR as unlawful because Defendants failed to seek consistency with the Utah Resource Management Plan or provide a formal opportunity for the Governor of Utah to submit a Governor's Consistency Review.

4.     Declare and set aside BLM's DR as unlawful because Defendants failed to follow and violated FLPMA's mandate to manage the public lands of the Labyrinth/Gemini Bridges TMA in

accordance with principles of multiple use and sustained yield.

5.      Declare and set aside the DR as unlawful and find that Defendants acted beyond their statutory authority to manage the lands accessed by the 317.2 total miles of closed roads, that Defendants are unlawfully managing lands as *de facto* wilderness in violation of FLPMA and other federal statutes.

6.      Declare and set aside the BLM's DR as unlawful under the regulations implementing Section 106 of the NHPA because the BLM failed to evaluate R.S. 2477 roads for National Register of Historic Places eligibility and assess effects of the DR on historic properties.

7.      Declare and set aside the BLM's DR as unlawful due to the BLM allowing its Principal Deputy Director to participate in the decision-making process for the DR despite being a signatory for a plaintiff organization in the 2017 SUWA Settlement Agreement.

Respectfully submitted this 29th day of May, 2024.

UTAH ATTORNEY GENERAL'S OFFICE

/s/ Jake Garfield
Kathy A.F. Davis
Jake Garfield
*Assistant Attorneys General*
Kendall Laws
*Special Assistant Attorney General*
Counsel for Plaintiffs

## <u>LIST OF EXHIBITS</u>

1. Labyrinth/Gemini Bridges Travel Management Plan Decision Record

2. Map of R.S. 2477 Roads Closed by Decision Record

3. 2008 Moab Field Office Resource Management Plan, Map #2, Designated Route Map

4. Map of Proposed Wilderness Areas in America's Red Rock Wilderness Act

5. 2017 SUWA Settlement Agreement

6. Labyrinth/Gemini Bridges TMP Cooperating Agency MOU

7. State of Utah April 2021 Comment Letter

8. State of Utah December 2021 Comment Letter

9. State of Utah October 2022 Comment Letter

10. Utah Governor's Consistency Review Letter

11. Map of SITLA Parcels with Access Blocked by Decision Record

12. Summary of Depositions on R.S. 2477 Roads Closed by Decision Record

13. April 2023 Section 106 Consultation Letter